T.C. Memo. 1996-203


UNITED STATES TAX COURT


THOMAS A. JOHNSON, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 13887-94.                    Filed April 29, 1996.


Thomas A. Johnson, pro se.

<u>Stephen C. Best</u>, for respondent.



MEMORANDUM OPINION

CLAPP, <u>Judge</u>:  Respondent determined the following deficiencies in petitioner's Federal income taxes, additions to tax, and penalty:

| | | Additions to tax | | | Penalty |
| Year | Deficiency | Sec. 6651(a)(1) | Sec. 6653(a)(1) | Sec. 6661 | Sec. 6662(a) |
| --- | --- | --- | --- | --- | --- |
| 1988 | $64,586 | $6,459 | $3,229 | $16,147 | -- |
| 1989 | 754 | 189 | -- | -- | $151 |

After concessions by the parties, the issues for decision are:

(1)  Whether petitioner had gross receipts during the taxable year 1988 from a business known as Ticketline.  We hold that he did.

(2)  Whether petitioner has substantiated cost of goods sold for Ticketline for the taxable year 1988.  We hold that petitioner has substantiated cost of goods sold in the amount of $143,004.

(3)  Whether petitioner is liable for self-employment tax for the taxable year 1988 from his activities with Ticketline. We hold that he is.

(4)  Whether the costs associated with petitioner's nutritional information system are deductible pursuant to section 174.  We hold that they are not.

(5)  Whether petitioner is liable for the addition to tax pursuant to section 6651(a)(1) for failure to file timely Federal income tax returns for the taxable years 1988 and 1989. We hold that he is.

(6)  Whether petitioner is liable for the addition to tax pursuant to section 6653(a)(1) for negligence for the taxable year 1988.  We hold that he is.

(7)  Whether petitioner is liable for the addition to tax pursuant to section 6661 for a substantial understatement of tax for the taxable year 1988.  We hold that he is.

(8) Whether petitioner is liable for an accuracy-related penalty pursuant to section 6662(a) for the taxable year 1989. We hold that he is.

All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.

We have combined our findings of fact and opinion. Some of the facts are stipulated and are so found. We incorporate by reference the stipulation of facts and attached exhibits.

Prior to trial, respondent filed a Motion for Leave to File Amendment to Answer. Respondent sought to amend the answer to plead collateral estoppel pursuant to this Court's opinion in Johnson v. Commissioner, T.C. Memo. 1993-564, affd. without published opinion 50 F.3d 2 (2d Cir. 1995) (Johnson I), which addressed the taxable year 1987. Respondent argues that collateral estoppel precludes petitioner from relitigating whether he received gross receipts from Ticketline, whether he is entitled to deduct expenses associated with his nutritional information system pursuant to section 174, and whether he is liable for self-employment tax. We denied respondent's motion.

The doctrine of collateral estoppel is used to preclude a party from relitigating issues actually and necessarily litigated and decided in a final prior judgment by a court of competent jurisdiction. Meier v. Commissioner, 91 T.C. 273, 282-283

(1988). It applies to issues of fact, issues of law, and mixed issues of fact and law. Id. at 283.

The taxable year 1987 was at issue in Johnson I, and that opinion was based in part on petitioner's failure to meet his burden of proof. We have concluded that the issues now before the Court were not necessarily litigated in Johnson I. Petitioner, in this proceeding, could prove different facts or changed circumstances sufficient to distinguish this case from Johnson I and to carry his burden of proof for the years at issue.

Petitioner resided in Vernon, Connecticut, at the time he filed the petition. He has a bachelor's degree in mathematics and a master's degree in psychology. Petitioner received training as an actuary and has consulted as a stock analyst. Petitioner did not receive salary or wages in 1988. Petitioner has prepared his own income tax returns since 1981, and he reported his income and deductions for the taxable years 1988 and 1989 on the cash receipts and disbursements method of accounting.

Ticketline

In 1985, petitioner began purchasing concert tickets from Robert Finnimore (Finnimore) through a business known as Ticketline. Finnimore purchased tickets to concerts, plays, and other events and then resold the tickets at a premium.

Finnimore needed cash to purchase tickets, so petitioner agreed to advance money to Finnimore, with the understanding that

petitioner would get the two best seats available for any concert or show that he wanted to attend.

Petitioner expected the advances to be returned, but this did not happen with regularity. To gain some control over the payment process, petitioner made the necessary arrangements so that customers could use a credit card to pay Finnimore for tickets. Petitioner controlled the credit card receipts and also set up a bank account in the name of Ticketline (Ticketline account) to hold those receipts. This arrangement made the money accessible to petitioner rather than having it go through Finnimore, who otherwise might have kept a fair amount of it. Petitioner had sole signatory authority on the Ticketline account. Credit card receipts were deposited directly to the Ticketline account, and petitioner made periodic deposits into that account of any money sent to him by Finnimore. He regularly advanced moneys from this account to Finnimore for the purchase of tickets.

During 1988, petitioner had signatory authority over three other accounts: The Todge Trust account, the Universal Life Church, Inc. (ULC) account, and an equity line of credit. Petitioner occasionally advanced moneys from these accounts for the purchase of tickets by Finnimore.

Finnimore did not execute promissory notes for the funds he received from petitioner. Petitioner reported no interest income for 1988 related to the funds advanced to Finnimore.

The parties agree that during 1988 petitioner made deposits to the Ticketline account of approximately $172,279. Respondent, using the bank deposits and cash expenditures method, determined this amount to be unreported income. Respondent concedes that this figure should be reduced to $167,949.

In the notice of deficiency, respondent did not allow for the cost of tickets sold, but respondent concedes that petitioner must have had some cost of goods sold. Respondent calculated cost of goods sold of $70,635 and is willing to concede this amount. Respondent calculated this amount using the ratio of cost of goods sold to gross receipts for the taxable year 1987 as set forth in Johnson I.

Where a taxpayer has failed to maintain adequate records of the amount and source of his income, and the Commissioner has determined that the deposits are income, the taxpayer must show that the Commissioner's determination is incorrect. Estate of Mason v. Commissioner, 64 T.C. 651, 657 (1975), affd. 566 F.2d 2 (6th Cir. 1977). In the absence of adequate books and records, the Commissioner may reconstruct a taxpayer's income by any reasonable method of accounting which clearly reflects income. Sec. 446; Holland v. United States, 348 U.S. 121, 130-132 (1954). The bank deposits method has long been approved by the courts as a method for computing income. Estate of Mason v. Commissioner, supra at 656. Bank deposits are prima facie evidence of income.

Tokarski v. Commissioner, 87 T.C. 74, 77 (1986); Estate of Mason v. Commissioner, supra at 656-657.

Petitioner argues that the advances from the various accounts were loans to Finnimore and that the deposits to the Ticketline account were repayments on the loans. The existence of a loan is a question of fact to be decided on the basis of all the facts. Beaver v. Commissioner, 55 T.C. 85, 91 (1970). Some of the relevant factors are: Whether the parties were dealing at arm's length; whether the loan was in writing; whether the loan provided for interest; whether repayments were made; whether there was a business purpose for making the loan; and whether payments are not contingent on profits. See Beaver v. Commissioner, supra; Arlen v. Commissioner, 48 T.C. 640, 648 (1967).

Petitioner had no promissory note or repayment schedule for the alleged loans. Petitioner submitted a document that he claimed was a loan ledger. The document does not mention loans to or repayments from Finnimore and does not establish that petitioner made loans to Finnimore. Petitioner claims that he began charging Finnimore interest in 1988, but petitioner reported no interest income from the alleged loans. Petitioner knew that he would not be repaid if Finnimore did not resell the tickets, and we find that ticket sales were the only source of repayment from Finnimore.

We find that the deposits to the Ticketline account were income to petitioner and were not loan repayments from Finnimore. See Dean v. Commissioner, 57 T.C. 32, 45 (1971).

Petitioner argues in the alternative that, if the $167,949 is income from the sale of tickets, he is entitled to reduce the income by the cost of the tickets sold. Petitioner did not keep adequate records of the moneys he advanced to Finnimore. Petitioner, therefore, looks to numerous canceled checks and cash withdrawals, which he maintains were advances to Finnimore. Petitioner argues that checks payable to cash, in even amounts of $1,000 or more, were moneys he advanced to Finnimore for the purchase of tickets. Petitioner concedes that some small portion of those checks was retained by him for personal purposes but argues that the balance went to Finnimore for the purchase of tickets. The amounts set forth in the appendix reflect the amounts advanced to Finnimore after allowing for petitioner's concessions. We find that petitioner advanced to Finnimore for the purchase of tickets $69,700 from the Ticketline account, $13,300 from the Todge Trust account, $43,250 from the equity credit line, and $5,000 from the ULC account. These payments are detailed in the appendix.

Petitioner paid $6,254 for tickets using his credit card, and this amount is allowable as cost of goods sold.

Petitioner contends that he purchased tickets directly from a ticket agent with check No. 1076 in the amount of $2,500 and

from a second ticket agent with check No. 1083 in the amount of $3,000. We agree, and we find that the $5,500 is allowable as cost of goods sold.

Petitioner estimated that he purchased tickets for Ticketline with $3,130 of automatic teller machine (ATM) withdrawals from the Todge Trust account. The $3,130 of ATM withdrawals from the Todge Trust account consists of approximately 17 withdrawals, none of which exceeds $300. Petitioner has not shown that the $3,130 in ATM withdrawals was for the purchase of tickets and not for personal expenditures. Petitioner argues that several items labeled "debit memo" on his bank statements represent either deductible expenses or cash withdrawals used for the purchase of tickets. The record does not support petitioner's argument. Petitioner provided the bank statements showing the "debit memo" notations. On brief, petitioner has attempted to explain the "debit memo" items, but factual representations on brief are not evidence. We sustain respondent's determination as to these items.

Based on the above findings, we conclude that petitioner has substantiated cost of goods sold for the Ticketline business in the amount of $143,004, which consists of $69,700 from the Ticketline account, $13,300 from the Todge Trust account, $43,250 from the equity credit line, $5,000 from the ULC account, $6,254 of credit card purchases, and $5,500 of purchases directly from ticket agents.

Respondent concedes a $3,173.21 deduction for credit card service fees and a $30.82 deduction for bank fees, and we find that petitioner paid $279.09 for Ticketline advertising expenses in 1988.

Petitioner argues that he paid $4,545.40 of other Ticketline expenses. These expenditures related to Finnimore's obligations for items such as office lease payments, car payments, car insurance, and rent on Finnimore's apartment. These expenditures were not ordinary and necessary expenses of Ticketline, and we sustain respondent's determination as to these items.

## Self-Employment Tax

Section 1401 imposes a tax on net earnings of $400 or more from self-employment income, defined as gross income derived from carrying on a trade or business, less allowable deductions. Sec. 1402(a) and (b). The parties agree that petitioner is liable for self-employment taxes if we find that he had unreported income in 1988. We have so found. Thus, petitioner is liable for self-employment taxes under section 1401.

## Nutritional Information System

Around 1987, petitioner began developing a nutritional information system that he called the "Food Store". Petitioner envisioned nutritional information stored in a computer to help grocery shoppers select food based on its nutritional value. Initially, petitioner intended to feature the nutritional information system in his own natural foods store. Petitioner

abandoned the idea of opening his own store and instead focused on the nutritional information system.

Petitioner paid the firm of Nordli Wilson to help him locate compatible business associates. In 1987, Sharon Akabas (Akabas), a nutritionist recommended by Nordli Wilson, helped petitioner develop the nutritional information needed for his system. Akabas has a doctorate in nutrition and exercise physiology, and she served as an adjunct professor at the University of Bridgeport, Connecticut, while she consulted with petitioner. Akabas attempted to simplify nutritional data contained in a database managed by the U.S. Department of Agriculture. Petitioner and Akabas attended conferences related to nutrition or nutritional data banks. Petitioner and Akabas had no written contract.

Petitioner also consulted with Paul Voiland (Voiland) and Steve Hendricken (Hendricken) during the development of the nutritional system. Petitioner advertised for a manager in a natural foods store, and Voiland responded. Voiland had worked in the natural food business for 14 years with experience in retail, wholesale, and production. He advised petitioner about natural food stores, how they are set up, and the types of products sold in them. Voiland also drafted and modified store floor plans for petitioner. Hendricken helped petitioner prepare a business plan. Petitioner had no written contract with either Voiland or Hendricken.

Petitioner compiled a notebook titled "The Food Comparison Machine" with a copyright date of 1991.  The notebook explains petitioner's nutritional information system.

Petitioner reported on Schedules C of his Federal income tax returns the following expenses for the Food Store:

|                           | 1988    | 1989      |
|---------------------------|---------|-----------|
| Supplies                  | $4,829  | $2,383.06 |
| Legal and professional fees | 20,231 | 23,999.01 |
| Dues and publications     | 1,635   | 0         |
| Meals and entertainment   | 98      | 56.30     |
| Travel                    | 674     | 502.78    |
| Utilities                 | 1,851   | 2,056.38  |
| Rent or lease             | 0       | 947.14    |
| Total                     | 29,318  | 29,944.67 |

Petitioner reported no gross receipts or sales for the Food Store in 1988 or 1989.

Petitioner contends that his expenditures related to the nutritional information system are deductible pursuant to section 174 as computer software developmental costs.

Petitioner must prove that he is entitled to the claimed deductions.  Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933).  Research or experimental expenses, for purposes of section 174, are research and developmental costs in the experimental or laboratory sense.  Mayrath v. Commissioner, 41 T.C. 582, 590 (1964), affd. 357 F.2d 209 (5th Cir. 1966).

Respondent acknowledges that the cost of developing computer software may qualify as research and experimental expenses.

Petitioner contends that expenditures for "utilities" and "rent or lease" relate to the business use of his home. Petitioner's wife testified that one room in their home was petitioner's office. We have insufficient evidence regarding the portion of petitioner's home used for business purposes, and he offered no evidence regarding the hours spent at his home for business purposes or the business activities performed at his home. We find that petitioner has not substantiated the expenditures related to the business use of his home. We sustain respondent's determination as to these items.

Petitioner has shown that the remaining expenditures he reported on the Schedules C were associated with the Food Store, and we now turn to whether they are deductible pursuant to section 174.

Petitioner paid consulting fees to Voiland, Hendricken, and Akabas. Voiland testified that he advised petitioner about natural foods stores, how they are set up, and the types of products sold in them. Voiland's advice included drawing and modifying floor plans for a natural foods store. Hendricken helped petitioner prepare a business plan. We find that these activities did not relate to the development of computer software.

Akabas testified that she reviewed the scientific literature on various nutritional issues, translated the literature into laypersons' terms, decided how to deliver nutritional information to the consumer, gathered nutritional information on various food products, reviewed several newsletters and journals related to nutrition, used her contacts at large corporations to obtain nutritional information on their products, reviewed computer magazines and manuals, and organized a group of college students to test petitioner's system. Akabas also attempted to simplify nutritional data contained in a database managed by the U.S. Department of Agriculture. Petitioner and Akabas attended conferences related to nutrition or nutritional data banks. Nothing in the record indicates that Akabas' activities were research in the experimental or laboratory sense or constituted the development of computer software.

The documents submitted in evidence do not show that petitioner ever developed any computer software. Petitioner submitted five letters he received from various grocery executives relating to the nutritional system. One letter was written in 1991, and four were written in 1992. The various executives refer to petitioner's "demonstration notebook", "proposal", "program", and "writeup". Petitioner submitted a notebook titled "The Food Comparison Machine", which explains petitioner's system. We presume the pages in the notebook illustrate what would appear on a computer screen, but we find

that these illustrations do not qualify as the development of computer software. Petitioner submitted a letter from an attorney dated December 11, 1992, the topic of which is the patentability of petitioner's system. Nothing in the letter indicates that petitioner was developing computer software in 1988 or 1989.

We presume that some of the nutritional information culled by Akabas found its way into the notebook titled "The Food Comparison Machine". Nonetheless, petitioner provided no evidence coupling the various expenditures to any research or experiment in nutritional science or computer software in 1988 or 1989. Petitioner repeatedly described his activities as the development of computer software. However, the record does not support petitioner's characterization of his activities, and his subjective belief is not determinative. See Mayrath v. Commissioner, supra at 590-591. We conclude that the expenditures are not deductible as research or experimental expenses under section 174. Accordingly, it is unnecessary to consider whether they were in connection with a trade or business or whether a proper election was made. We sustain respondent's determination.

Additions to Tax Under Section 6651(a)(1)

Respondent determined an addition to tax under section 6651(a)(1) for each year in issue, asserting that petitioner failed to file timely a Federal income tax return.

Petitioner's 1988 and 1989 Federal income tax returns were due on August 15, 1989, and August 15, 1990, respectively. Petitioner filed his 1988 Federal income tax return on September 27, 1989, and he filed his 1989 Federal income tax return on September 18, 1991.  Petitioner presented no evidence to show that the untimely filings were due to reasonable cause and not due to willful neglect.  We sustain respondent's determination that petitioner is subject to an addition to tax under section 6651(a)(1) in each year.

Negligence Addition to Tax and Penalty

Respondent determined that petitioner is liable for an addition to tax under section 6653(a)(1) for the taxable year 1988 and that petitioner is liable for a penalty under section 6662(a) for the taxable year 1989.  Section 6653(a)(1) imposes an addition to tax equal to 5 percent of the underpayment if any part of the underpayment is attributable to negligence.  Section 6662(a) imposes a penalty equal to 20 percent of the portion of the underpayment which is attributable to negligence.

Negligence is defined as the lack of due care or the failure to do what a prudent person would do under the circumstances. Marcello v. Commissioner, 380 F.2d 499, 506 (5th Cir. 1967), affg. in part and remanding in part 43 T.C. 168 (1964); Neely v. Commissioner, 85 T.C. 934, 947 (1985).  Petitioner must prove that the negligence addition to tax and the penalty do not apply. Bixby v. Commissioner, 58 T.C. 757, 791 (1972).

Failure to keep adequate records is some evidence of negligence.  Marcello v. Commissioner, supra at 507;  Magnon v. Commissioner, 73 T.C. 980, 1008 (1980).  Petitioner did not maintain adequate records regarding the funds disbursed to or received from Finnimore.  Petitioner argues that he loaned funds to Finnimore; yet, none of the advances carried the indicia of a loan.

Petitioner offered no evidence connecting his nutritional system to computer software or any other research or experiment. Petitioner deducted items for the business use of his home, but he failed to produce evidence supporting the deductions.

We conclude that the underpayments for the taxable years 1988 and 1989 are attributable to negligence.

Addition to Tax Under Section 6661

Respondent determined that petitioner is liable for an addition to tax under section 6661 for the taxable year 1988. Section 6661(a) provides for an addition to tax equal to 25 percent of the amount of any underpayment attributable to a substantial understatement of income tax.  Pallottini v. Commissioner, 90 T.C. 498, 501 (1988).  An understatement is substantial if it exceeds the greater of $5,000 or 10 percent of the tax required to be shown on the return.  Sec. 6661(b).  The amount of the understatement may be reduced under section 6661(b)(2)(B) for amounts adequately disclosed or supported by substantial authority.  Respondent's determination of the

addition to tax is presumed correct, and petitioner must prove otherwise. Rule 142(a); <u>Hall v. Commissioner</u>, 729 F.2d 632, 635 (9th Cir. 1984), affg. T.C. Memo. 1982-337; <u>Bixby v. Commissioner</u>, <u>supra</u> at 791-792.

Petitioner makes no argument with regard to substantial authority or adequate disclosure, and we find that no such argument exists. If recomputation of petitioner's tax liability reflects a substantial understatement, petitioner is liable for the addition to tax.

To reflect the foregoing and the concessions by the parties,

<u>Decision will be entered</u>

<u>under Rule 155.</u>

APPENDIX

### Ticketline Account

| Date | Check Number | Ticket Expense |
|------|------|------|
| Feb.   9 | 1058 | $3,000 |
| Feb.  26 | 1060 | 6,000 |
| Mar.   7 | 1062 | 2,000 |
| Mar.  10 | 1065 | 1,000 |
| Mar.  18 | 1067 | 2,000 |
| Mar.  24 | 1068 | 3,000 |
| Mar.  28 | 1069 | 1,000 |
| Mar.  29 | 1070 | 5,000 |
| Apr.   4 | 1071 | 2,000 |
| Apr.  15 | 1075 | 10,000 |
| May   24 | 1085 | 5,000 |
| June   6 | 1086 | 5,500 |
| June  24 | 1087 | 4,000 |
| July  11 | 1089 | 3,000 |
| July  21 | 1091 | 4,700 |
| Aug.  29 | 1095 | 6,000 |
| Sept.  9 | 1097 | 3,000 |
| Sept. 19 | 1100 | 3,500 |
| Total |  | 69,700 |

### Todge Trust Account

| Date | Check Number | Ticket Expense |
|------|------|------|
| Feb.   5 | 1576 | $1,300 |
| Feb.  25 | 1585 | 2,000 |
| June  30 | 1698 | 2,000 |
| Aug.  31 | 1759 | 2,500 |
| Sept. 19 | 1782 | 1,500 |
| Oct.  19 | 1808 | 4,000 |
| Total |  | 13,300 |

## Equity Credit Line

| Date | Check Number | Ticket Expense |
|------|--------------|----------------|
| July 9 | 101 | $3,000 |
| July 25 | 102 | 2,450 |
| Aug. 4 | 103 | 5,000 |
| Aug. 5 | 104 | 2,000 |
| Aug. 12 | 105 | 10,000 |
| Sept. 9 | 106 | 7,000 |
| Sept. 15 | 108 | 3,400 |
| Nov. 10 | 111 | 4,000 |
| Dec. 3 | 113 | 6,400 |
| Total | | 43,250 |

## ULC Account

| Date | Check Number | Ticket Expense |
|------|--------------|----------------|
| Jan. 25 | 137 | $5,000 |